René P. Tatro (SBN 078383)
Juliet A. Markowitz (SBN 164038)
TATRO TEKOSKY SADWICK LLP
1800 N. Vine Street, Suite 234
Los Angeles, CA 90028
Telephone: (213) 225-7171
Facsimile: (213) 225-7151
E-mail: rtatro@ttsmlaw.com
jmarkowitz@ttsmlaw.com

Attorneys for Defendant
CVS Pharmacy, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

HELEN WITTMAN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CVS PHARMACY, INC.;

Defendant.

Case No. 5:26-cv-02827-SSS (DTBx)

**CVS PHARMACY, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION**

Honorable Sunshine S. Sykes

Date: October 16, 2026
Time: 2:00 p.m.
Dept: Riverside Ctrm. 2, 2nd Floor
(Via Zoom)

# TABLE OF CONTENTS

Page

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

A. CVS offers customers a loyalty program, called ExtraCare .......... 3

B. Wittman voluntarily joined the ExtraCare loyalty program .......... 3

C. Wittman Received an email on March 19, 2025 informing her of updated ExtraCare Terms .......... 4

D. The ExtraCare Terms require arbitration and include a class action waiver .......... 5

E. Wittman did not opt out of the ExtraCare Terms, and continued to use and enjoy the ExtraCare benefits .......... 10

ARGUMENT .......... 10

A. The Federal Arbitration Act mandates arbitration where, as here, a valid arbitration agreement covers the dispute, and any doubts regarding arbitrability must be resolved in favor of arbitration .......... 10

B. The FAA applies to the arbitration agreement in the ExtraCare Terms .......... 13

C. An arbitration agreement exists and is valid and binding .......... 14

D. The dispute falls within the broad scope of the arbitration provisions .......... 20

E. Wittman did not opt out of the arbitration provisions .......... 21

F. The arbitration should proceed on an individual basis .......... 21

G. A stay of all case deadlines is requested while the Court considers this motion. .......... 21

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

*Cases* Page

*Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265 (1995) ........ 13

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) ........ 14, 21

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ........ 11, 15, 21

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) ........ 12

*Blau v. AT&T Mobility,* 2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ........ 15

*Brewer v. Jersey Mike's, Inc. et al.*, 2026 WL 2367683 (C.D. Cal. Aug. 6, 2026) ........ 16, 17

*Britton v. Co-op Banking Grp.,* 4 F.3d 742 (9th Cir. 1993) ........ 20

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) ........ 11

*Campos v. Bluestem Brands, Inc.,* 2016 WL 297429 (D. Or. Jan. 22, 2016) ........ 15

*Cayanan v. Citi Holdings, Inc.,* 928 F. Supp. 2d 1182 (S.D. Cal. 2013) ........ 20

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000) ........ 12, 20

*Christian v. Pressed Juicery, Inc.*, 2021 WL 4771801 (C.D. Cal. Apr. 23, 2021) ........ 13, 14, 20

*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003) ........ 13

*Cordas v. Uber Techs., Inc.*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) ..................................................... 15

*Crawford v. Beachbody, LLC*,
2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ..................................................... 16

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ..................................................... 11

*Deneau v. Coastal Home Care Servs., Inc.*,
2024 WL 3844723 (N.D. Cal. Aug. 12, 2024) ..................................................... 13

*Dickey v. Ticketmaster*,
2019 WL 9096443 (C.D. Cal. Mar. 12, 2019) ..................................................... 16

*Driskill v. Experian Info. Sols., Inc.*,
2024 WL 4453292 (N.D. Cal. Oct. 8, 2024) ..................................................... 12

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ..................................................... 15

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) ..................................................... 17-19

*Graf v. Match.com, LLC*,
2015 WL 4263957 (C.D. Cal. July 10, 2015) ..................................................... 16

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) ..................................................... 12

*Hofer v. Emley*,
2019 WL 4575389 (N.D. Cal. Sept. 20, 2019) ..................................................... 13

*In re Facebook Biometric Info. Priv. Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) ..................................................... 17

*In re Uber Techs., Inc.*,
2019 WL 6317770 (C.D. Cal. Aug. 19, 2019) ..................................................... 17

*Intertec Contracting v. Turner Steiner Int'l, S.A.*,
2001 WL 812224 (S.D.N.Y. July 18, 2001) ..................................................... 22

*Jackson v. Amazon.com, Inc.*,
559 F. Supp. 3d 1132 (S.D. Cal. 2021),
*aff'd*, 65 F.4th 1093 (9th Cir. 2023) ........ 11

*Kamath v. Coinbase, Inc.*,
2024 WL 950163 (N.D. Cal. Mar. 5, 2024) ........ 18

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) ........ 14

*Marselian v. Wells Fargo & Co.*,
514 F. Supp. 3d 1166 (N.D. Cal. 2021) ........ 15

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ........ 15

*Mohamed v. Uber Techs., Inc.*,
109 F. Supp. 3d 1185 (N.D. Cal. 2015),
*rev'd in part on other grounds*, 848 F.3d 1201 (9th Cir. 2016) ........ 16

*Moran v. Charter Commc'ns, Inc.*,
2020 WL 5833640 (C.D. Cal. June 11, 2020) ........ 14

*Mortensen v. Bresnan Communs., LLC*,
722 F.3d 1151 (9th Cir. 2013) ........ 12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ........ 11, 12, 21

*Murphy v. DirecTV, Inc.*,
724 F.3d 1218 (9th Cir. 2012) ........ 21

*New Prime Inc. v. Oliveira*,
139 S. Ct. 532 (2019) ........ 13

*Sadlock v. Walt Disney Co.*,
2023 WL 4869245 (N.D. Cal. July 31, 2023) ........ 17-19

*Selden v. Airbnb, Inc.*,
4 F.4th 148 (D.C. Cir. 2021) ........ 15

*Sellers v. JustAnswer LLC*,
73 Cal.App.5th 444 (2021) ........ 19

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) ........ 11, 12

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ........ 12

*Stiener v. Apple Computer, Inc.*,
2007 WL 4219388 (N.D. Cal. Nov. 29, 2007) ........ 21

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal., 2011) ........ 16

*Tanis v. Sw. Airlines, Co.*,
2019 WL 1111240 (S.D. Cal. Mar. 11, 2019) ........ 16

*United States v. Sutcliffe,*
505 F.3d 944 (9th Cir. 2007) ........ 14

*Valdez v. Genesis Healthcare LLC*
2019 WL 6604868 (C.D. Cal. July 15, 2019) ........ 13

*Victrola 89, LLC v. Jaman Props. 8 LLC,*
46 Cal.App.5th 337 (2020) ........ 14

*Voll v. HCL Techs. Ltd.,*
2019 WL 144863 (N.D. Cal. Jan. 9, 2019) ........ 15

*Ware v. Golden 1 Credit Union, Inc.*,
375 F. Supp. 3d 1145 (E.D. Cal. 2019) ........ 12

*Webber v. Uber Techs., Inc.*,
2018 WL 10151934 (C.D. Cal. Sept. 5, 2018) ........ 17

*West v. Uber Techs.*,
2018 WL 5848903 (C.D. Cal. Sept. 5, 2018) ........ 17

*Federal Statutes*

9 U.S.C. § 1 *et seq.* ........ 1, 7, 14

9 U.S.C. § 2 ........ 11, 13

9 U.S.C. § 3 ........ 12

9 U.S.C. § 4 ........ 11, 12

*State Statutes*

Cal. Bus & Prof. Code § 17200, *et seq.* (Unfair Competition Law) ........ 2

Cal. Bus & Prof. Code § 17500, *et seq.* (False Advertising Law) ........ 2

Cal. Civ. Code § 1750 *et seq.* (Consumer Legal Remedies Act) ........ 2

Cal. Com. Code § 2313(1) ........ 2

Cal. Com. Code § 2314 ........ 2

## INTRODUCTION

Plaintiff Helen Wittman ("Wittman") fails to state a claim for the reasons set forth in the concurrently filed motion to dismiss of Defendant CVS Pharmacy, Inc. ("CVS"). Before reaching that motion, however, this Court is respectfully requested to compel arbitration of Wittman's claims because Wittman, by agreeing to the terms and conditions of CVS's ExtraCare® customer loyalty program (the "Terms"), agreed to arbitrate "[a]ny Dispute" (defined to mean "any claims or controversies" with CVS) on an individual basis. CVS's Terms govern purchases at CVS made using the ExtraCare program, and therefore govern Wittman's claims here, which are based on her March 2, 2026 ExtraCare purchase of CVS Calcium 1200 mg + D3.

The ExtraCare Terms include a binding arbitration agreement, a class-action waiver and a jury trial waiver pursuant to which Wittman waived any right to bring or participate in a class action lawsuit against CVS. A March 19, 2025 email to Wittman from CVS advised Wittman of a change to the Dispute Resolution provisions of the ExtraCare Terms. The email included links to the full and complete Terms, including the clear and conspicuous mandatory dispute resolution provisions. Those provisions require Wittman's claims to be arbitrated in accordance with the Comprehensive Dispute Resolution Rules and Procedures and/or the Mass Filing Supplemental Dispute Resolution Rules and Procedures of National Arbitration and Mediation ("NAM") (hereinafter, "NAM Rules"). The Terms also require the arbitration to be administered by NAM. Accordingly, Wittman's claims may not be litigated in this Court or any other court (with the limited exception of claims asserted in small claims court). As set forth in the ExtraCare Terms, the agreement to arbitrate is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). Although the Terms informed Wittman of her right to opt out of arbitration and how she could do so, Wittman did not undertake any steps necessary to opt out. Instead, she continued to make numerous purchases using the rewards available under the CVS ExtraCare program, including the single purchase on which her legal claims are based.

The parties' agreement to arbitrate all of their disputes and Wittman's class action and jury trial waivers notwithstanding, Wittman filed a Complaint against CVS in this Court on May 26, 2026, alleging violations of several California consumer protection statutes—the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*., False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq*., and Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. (all purportedly on behalf of herself and on behalf of a putative California class of consumers)—as well as claims for breach of express warranties (Cal. Com. Code § 2313(1)), breach of implied warranties (Cal. Com. Code § 2314), negligent misrepresentation, intentional misrepresentation/fraud, and quasi-contract/unjust enrichment (all purportedly on behalf of herself and on behalf of a class of nationwide consumers). Both before and after the Complaint was filed, CVS advised Wittman's counsel of Wittman's obligation to arbitrate and her class action and jury trial waivers. (Declaration of Juliet A. Markowitz filed herewith, ¶ 4). Wittman's counsel did not provide any substantive explanation for why Wittman should be able to shirk that obligation or ignore those waivers. (*Id*.).

Each of Wittman's claims is based on her alleged one-time purchase of CVS Calcium 1200 mg + D3 ("Calcium") at a brick-and-mortar CVS store in March 2026. Although Wittman does not allege she made any other purchase, Wittman also asserts claims based on the sale to others of an unrelated product, CVS Glucosamine HCI 1500 mg Chondroitin Sulfate 1200 mg ("Glucosamine") (collectively, the CVS Calcium and Glucosamine products are referred to herein as the "Products"). Wittman contends that she, along with members of the putative class of consumers nationwide, was led to believe that the dosage listed on the front of each Product label (for example, 1200 mg of calcium) can be obtained by taking only one softgel or capsule, even though the serving size stated on the Supplement Facts panel of the label is two softgels (Calcium) and three capsules (Glucosamine). (*See generally* Dkt. 1, Complaint).

Because Wittman unequivocally agreed to arbitrate her claims only on an individual basis, CVS seeks to compel arbitration of Wittman's claims and stay Wittman's Complaint

pending completion of the arbitration. CVS also seeks to stay discovery and other scheduling deadlines while the Court considers this threshold motion for the sake of judicial and party economy.

## FACTUAL BACKGROUND

### A. CVS offers customers a loyalty program, called ExtraCare.

CVS operates thousands of retail stores and sells a variety of products, both online and in-store. (*See* Declaration of Amanda L. Asermely ("Asermely Decl.") filed herewith, ¶ 1). Like many retailers, CVS has a customer rewards program, called ExtraCare, which allows customers who join the program to receive access to special promotions, discounts, and coupons on various products, including 2% back in "ExtraBucks Rewards® on certain purchases, sale prices, special offers on receipts and sent via email (and text, for consumers who opt-in), and more. (*Id.*, ¶ 2).

Customers can choose to join ExtraCare by signing up for an account. (*Id.*, ¶ 3). There is no charge to a customer to create an ExtraCare account, nor to receive the promotions, discounts, and coupons offered through the program. (*Id.*). The coupons and other benefits offered to ExtraCare members are communicated to members on a regular basis through various methods. (*Id.*).

### B. Wittman voluntarily joined the ExtraCare loyalty program.

On August 15, 2017, Wittman voluntarily enrolled in CVS's ExtraCare program. (*Id.* ¶ 5 & Exh. A). Wittman did so on a tablet device inside a Target store. (*Id.* ¶ 6 & Exh. A thereto). Wittman provided an email address for purposes of contacting her. (*Id.* ¶ 7 & Exh. A). Wittman also opted to enroll in SMS text messages. (*Id.*). Wittman's ExtraCare account is still active. (*Id.*). Using her ExtraCare account, Wittman made a single purchase of CVS Calcium 1200 mg + D3 on March 2, 2026. (*Id.* ¶ 8). This was less than three months before she filed this action. Wittman purchased other dietary supplements using her ExtraCare account going back several years, in some instances using ExtraCare coupons. (*Id.* ¶ 8).

**C. Wittman received an email on March 19, 2025 informing her of updated ExtraCare Terms.**

By voluntarily enrolling in the CVS ExtraCare Program, customers (including Wittman) agree to contractual Terms, which are set forth below. (*Id.* ¶ 4). At all relevant times, ExtraCare participants agreed that CVS could update ExtraCare terms and conditions from time to time, and advise of any changes via the email address the customer provided. (Asermely Decl. Exh. C, CVS Terms at p.1).

On March 19, 2025, CVS sent an email to Wittman and all CVS ExtraCare members to notify them of important updates to the Terms. (Asermely Decl. ¶ 9 & Exh. B thereto). At 13:59:05 on March 19, 2025, the update email was sent to Wittman at the email address she used to sign up for ExtraCare. (Asermely Decl. ¶ 10). There was no error recorded with transmission of the email to Wittman's email address, and the March 19, 2025 email to Wittman was not returned as undeliverable. (*Id.*).

The subject line of the March 19, 2025 email is: "Updates to ExtraCare Terms and Conditions." (*Id.* ¶ 11). The body of the email informed Wittman and ExtraCare members that the ExtraCare Terms and Conditions have been updated including, specifically, the Dispute Resolution terms. (*Id.* ¶¶ 12–14 & Exh. B). The body of the email also informed Wittman and ExtraCare members that "[b]y continuing to use and enjoy the benefits of your ExtraCare membership, you acknowledge that you have read and agreed to these updated terms and conditions." (*Id.*). That is, the body of the email included the following:


extracare®

We've updated our ExtraCare® terms and conditions

We're writing to inform you that our ExtraCare Terms & Conditions, including Dispute Resolution terms, have been updated. By continuing to use and enjoy the benefits of your ExtraCare membership, you acknowledge that you have read and agreed to these updated terms and conditions.

Thanks for being part of the ExtraCare family!

Review updated terms and conditions

As shown above and in Exhibit B to the Asermely Declaration, the March 19, 2025 email included two separate hyperlinks, either of which allowed customers to view the ExtraCare Terms. One is an underlined bolded link to "ExtraCare Terms & Conditions" written in a larger font than the rest of the surrounding text. The second is in a conspicuous red rectangular box in which is written, in white letters, Review updated terms and conditions. Clicking on either link took the customer to the updated ExtraCare Terms. (Asermely Decl. ¶¶ 15–16 & Exh. B).

**D. The ExtraCare Terms require arbitration and include a class action waiver.**

The ExtraCare Terms to which the March 19, 2025 email linked, and which were in effect when Wittman purchased the CVS Calcium using her ExtraCare account on March 2, 2026, included, in the first paragraph below the title, written conspicuously in all capital letters, an advisory to read the Terms carefully, and that they include an arbitration provision, a jury trial waiver, and a class action waiver, all of which affect the customer's rights. (Asermely Decl. ¶¶ 17–18 & Exh. C, Terms). That is, the Terms provide as follows:

> **CVS Pharmacy® ExtraCare® Terms and Conditions**
>
> THESE TERMS CONTAIN AN ARBITRATION PROVISION, JURY TRIAL WAIVER, AND A CLASS ACTION WAIVER THAT AFFECT YOUR RIGHTS. IN ARBITRATION, THERE IS NO JUDGE OR JURY, AND THERE IS LESS DISCOVERY AND APPELLATE REVIEW THAN IN COURT. DETAILS ARE SET FORTH BELOW. PLEASE REVIEW CAREFULLY.

The Dispute Resolution section appeared in Section 11 of the Terms, and began with a bolded heading as follows:[1]

> **DISPUTE RESOLUTION**
>
> **ARBITRATION AGREEMENT; JURY TRIAL WAIVER; CLASS ACTION WAIVER; JURISDICTION AND VENUE.**

[1] All facts in this subsection are set forth in ¶¶ 20–24 of the Asermely Decl. and at pp.9–15 of Exhibit C thereto.

The first paragraph of the Dispute Resolution section of the Terms, immediately following the bold heading above, is written conspicuously in all capital letters and advises customers to read the section carefully because it affects their legal rights, as follows:

> PLEASE READ THIS SECTION CAREFULLY. IT CONTAINS AN ARBITRATION AGREEMENT. THIS SECTION MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT AND TO HAVE A JURY HEAR YOUR CLAIMS. THIS SECTION ALSO CONTAINS PROCEDURES FOR FINAL BINDING INDIVIDUAL ARBITRATION AND A WAIVER OF ANY AND ALL RIGHTS TO PROCEED IN A CLASS, COLLECTIVE, CONSOLIDATED, PRIVATE ATTORNEY GENERAL, OR REPRESENTATIVE ACTION (COLLECTIVELY, "CLASS ACTION") IN ARBITRATION OR LITIGATION.

The next paragraph of the Dispute Resolution section of the Terms, again in conspicuous all capital letters, informs consumers that the Terms include a waiver of jury trial and class action rights, as follows:

> THIS SECTION ALSO ADDRESSES THAT YOU AND CVS ARE GIVING UP THE RIGHT TO HAVE A JURY TRIAL TO THE FULLEST EXTENT PERMISSIBLE BY APPLICABLE LAW AND TO FILE OR PARTICIPATE IN A CLASS ACTION SUBJECT TO THE LIMITED EXCLUSION BELOW. IN ARBITRATION, DISPUTES ARE RESOLVED BY AN ARBITRATOR, NOT A JUDGE OR JURY, AND THERE IS LESS DISCOVERY AND APPELLATE REVIEW THAN IN COURT.

The Dispute Resolution section of the Terms then continues as follows:

> Most customer concerns can be resolved by calling Customer Service at 1-800-SHOP CVS 1-800-746-7287 (TTY:711). In the event Customer Service is unable to resolve a complaint to your satisfaction, this Section explains how any Dispute (as defined below) will be resolved.
>
> For purposes of this Section, the terms "CVS," "our," "we," or "us" include CVS Pharmacy, Inc., its subsidiaries or affiliates, as well as any of their respective present or future affiliates or subsidiaries, and any

> persons or entities (including agents, representatives, or employees) related to CVS or its present or future affiliates or subsidiaries.

The Dispute Resolution section of the Terms includes a subsection entitled "Arbitration Agreement." The Arbitration Agreement includes mandatory informal resolution requirements before initiating arbitration. In pertinent part, these provisions are as follows:

> **a) Arbitration Agreement.** YOU AND CVS AGREE THAT ANY DISPUTE (DEFINED BELOW) SHALL BE RESOLVED BY FINAL AND BINDING INDIVIDUAL ARBITRATION EXCEPT AS OTHERWISE PROVIDED HEREIN. NOTWITHSTANDING THE FOREGOING, EITHER PARTY MAY ELECT TO HAVE INDIVIDUAL CLAIMS HEARD IN SMALL CLAIMS COURT IF THOSE CLAIMS QUALIFY FOR SMALL CLAIMS COURT AND SO LONG AS THE MATTER REMAINS IN SUCH COURT AND IS NOT REMOVED OR APPEALED TO A COURT OF GENERAL JURISDICTION AND ADVANCES ONLY ON AN INDIVIDUAL (NON-CLASS ACTION BASIS). ANY DISPUTE OVER WHETHER CLAIMS QUALIFY FOR SMALL CLAIMS COURT IS FOR THE SMALL CLAIMS COURT TO DECIDE IN THE FIRST INSTANCE AND, IF NECESSARY, FOR A COURT OF COMPETENT JURISDICTION TO DECIDE.
>
> You and CVS agree that this Agreement affects interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and federal arbitration law apply to this Arbitration Agreement and govern all questions as to whether a Dispute is subject to arbitration.
>
> For purposes of this Section, "Dispute" shall include, but is not limited to, any claims or controversies between you and CVS that are related in any way to this Agreement, including, but not limited to, your use of the Site, sales, returns, refunds, cancellations, defects, policies, privacy, advertising, and/or any communications between you and CVS, whether occurring on the Site, in-store, or otherwise, even if the Dispute arises after the termination of your relationship with CVS. "Dispute" also includes, without limitation, claims that: (a) you bring against CVS; (b) CVS brings against you; (c) in any way relate to or arise out of any aspect of the relationship between you and CVS, whether based in contract, tort, statute, fraud, misrepresentation, advertising claims, or any other

legal theory; (d) arose before you entered into this Agreement or out of a prior agreement with CVS (including, without limitation, claims relating to advertising); (e) are subject to ongoing litigation where you are not a party or a member of a certified class; and/or (f) arise after the termination of this Agreement. "Dispute," however, does not include disagreements or claims concerning patents, copyrights, trademarks, and trade secrets and claims of piracy or unauthorized use of intellectual property or claims for personal bodily injury, which shall not be subject to arbitration or the notice and informal process described below. The arbitrator shall decide all issues except for: (a) those that are specifically reserved for a court herein; (b) those issues relating to the scope, validity, and enforceability of the Arbitration Agreement or any of the provisions of this Section; (c) any issues arising from or relating to the arbitrability of any Dispute; and (d) whether the arbitration administrator cannot or will not administer the arbitration in accordance with this Arbitration Agreement—all of which are for a court of competent jurisdiction to decide. This Arbitration Agreement does not prevent you from bringing your Dispute to the attention of any federal, state, or local government agency.

**1. Mandatory Pre-Arbitration Informal Dispute Resolution.** You and CVS agree to engage cooperatively to try to resolve any Dispute informally prior to you or CVS initiating an arbitration proceeding. You or CVS must first send a written notice to the other party providing a detailed description of the Dispute; your or our name and contact information (address, telephone number, email address, and account number if applicable); sufficient information to enable you or us to identify any transaction at issue (including any receipts or purchase details); and a detailed description of: (a) the nature and basis of the Dispute and any claims and (b) the nature and basis of the relief sought (including a detailed calculation of any damages). Your notice to us must be personally signed by you (and your attorney if you are represented by legal counsel). Our notice to you must be personally signed by a CVS representative (and our attorney if we are represented by legal counsel).

Your notice to CVS must be sent to CVS Pharmacy, Inc., c/o CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914. Our notice to you must be sent to the most recent contact information that you have provided to us.

For a period of 60 days from the date of receipt of a completed notice from the other party, you and we will work together using reasonable

> efforts to try to resolve the Dispute. If requested by us in connection with a notice initiated by you, you agree to personally participate in an individualized telephone settlement conference (and if you are represented by an attorney, your attorney may also participate) to discuss a potential early resolution of the matter. If requested by you in connection with a notice initiated by us, we agree to have a CVS representative personally participate in an individualized, telephone settlement conference (and if we are represented by an attorney, our attorney may also participate). If the Dispute is not resolved within this 60-day period (which can be extended by agreement of the parties), you or we may commence arbitration consistent with the process set forth below. Compliance with this informal dispute resolution process is mandatory and a condition precedent to initiating arbitration.
>
> Any applicable limitations period (including statutes of limitations) shall be tolled while the parties engage in this informal dispute resolution process.
>
> If the sufficiency of a notice or compliance with this informal dispute resolution process is at issue, such issue may be raised with and decided by a court of competent jurisdiction at either party's election, and the parties agree that any arbitration shall be stayed pending resolution of the issue. The court shall have the authority to enforce this condition precedent to arbitration, which includes the power to enjoin the filing or prosecution of a demand for arbitration. You or we may also elect to raise non-compliance with this informal dispute resolution process and seek relief in arbitration.

The Dispute Resolution section of the Terms also includes a subsection entitled "Waiver of Jury Trial; Waiver of Class Actions." The body of this subsection is also written in conspicuous capital letters, as follows:

> **b) Waiver of Jury Trial; Waiver of Class Actions.** TO THE FULLEST EXTENT PERMISSIBLE BY APPLICABLE LAW, YOU AND CVS WAIVE THE RIGHT TO A JURY TRIAL. YOU AND CVS ALSO WAIVE ANY RIGHT TO BRING OR PARTICIPATE IN A CLASS ACTION IN ARBITRATION OR IN LITIGATION IN COURT. NOTWITHSTANDING THE FOREGOING, THE PARTIES RETAIN THE RIGHT TO PARTICIPATE IN A CLASS-WIDE SETTLEMENT.

### E. Wittman did not opt out of the ExtraCare Terms, and continued to use and enjoy the ExtraCare benefits.

The Arbitration Agreement subsection of the ExtraCare Terms informs members that they may opt out of arbitration and how to do so. (Asermely Decl. ¶ 25). That is, it provides as follows:

> **Opt-out.** You have the right to opt out of arbitration by sending your personally signed, written notice of your decision to opt out to the following address: CVS Pharmacy, Inc., c/o CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914, postmarked within 60 days of the first time you agreed to terms with CVS that included an arbitration agreement. You must include: (a) your name and residential address; (b) the email address and/or telephone number associated with your account; and (c) a clear statement that you want to opt out of arbitration and seek to have any Dispute addressed in a court of competent jurisdiction consistent with this Agreement. By opting out of arbitration, all other provisions in this Agreement, including the class action waiver and jury trial waiver, remain in effect to the fullest extent permissible by applicable law.

(*Id.* & Exh. C at p.16).

Wittman did not opt out of the ExtraCare dispute resolution Terms at any time. (Asermely Decl. ¶ 26).

Moreover, after receiving the March 19, 2025 email with the updated ExtraCare Terms—including the note that that "[b]y continuing to use and enjoy the benefits of your ExtraCare membership, you acknowledge that you have read and agreed to these updated terms and conditions"—Wittman continued to use and enjoy the CVS ExtraCare benefits. (*Id.* ¶ 27). Specifically, since March 19, 2025 and through May 20, 2026, Wittman has made at least 52 separate purchases using her ExtraCare account, including the purchase on which her claims here are based, *i.e.*, her March 2, 2026 purchase of CVS Calcium. (*Id.*).

## ARGUMENT

### A. The Federal Arbitration Act mandates arbitration where, as here, a valid arbitration agreement covers the dispute, and any doubts regarding arbitrability must be resolved in favor of arbitration.

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a

contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "strong federal policy favoring arbitral dispute resolution." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999).[2]

As the United States Supreme Court aptly noted, "[t]he 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (internal citation omitted). Congress enacted the FAA "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983). Accordingly, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate" may move a federal district court to compel arbitration. 9 U.S.C. § 4.

The FAA strongly favors enforcement of arbitration agreements and "places arbitration agreements on equal footing with all other contracts." *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (citing 9 U.S.C. § 2). A district court must compel arbitration if a valid arbitration agreement covers the dispute. As the Supreme Court has recognized, in determining whether a particular dispute should be arbitrated, the FAA "leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (holding that federal courts must "rigorously enforce agreements to arbitrate"). If a court finds a valid agreement to arbitrate exists and that it encompasses the dispute, the FAA requires the court to refer the matter to arbitration. *Id.*

---

[2] California courts apply this same pro-arbitrability presumption. *See Jackson v. Amazon.com, Inc.*, 559 F. Supp. 3d 1132, 1143 (S.D. Cal. 2021), *aff'd*, 65 F.4th 1093 (9th Cir. 2023).

A motion to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quotation and citation omitted). Moreover, courts must resolve any doubts regarding arbitrability in favor of arbitration. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25. "The standard for demonstrating arbitrability is not high," *Simula*, 175 F.3d at 719, and the party attempting to avoid arbitration bears the burden of proving that the claims are not arbitrable, *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000).

The merits of the underlying dispute cannot be considered when deciding a motion to compel arbitration. *See AT&T Technologies, Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 649-50 (1986). Instead, this Court may, at most, determine only: (1) whether a valid arbitration agreement exists, and, if so, (2) whether the arbitration agreement encompasses the dispute at issue. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citing 9 U.S.C. § 4); *see also Ware v. Golden 1 Credit Union, Inc.*, 375 F. Supp. 3d 1145, 1150 (E.D. Cal. 2019) (same). If the response is affirmative on both counts, as it is in the present case, "the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron*, 207 F.3d at 1130. Importantly, the party challenging the arbitration clause (here, Wittman) "bear[s] the burden of proving that the provision is unenforceable" based on validity and scope. *Mortensen v. Bresnan Communs., LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)). Wittman cannot meet her burden.

In addition, the FAA provides that if litigation is filed "upon any issue referable to arbitration under an agreement," the court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added); *Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024) (holding that courts that refer cases to arbitration must stay proceedings pending arbitration, if requested). Courts in the Ninth Circuit regularly stay cases pending arbitration. *See, e.g.*, *Driskill v. Experian Info. Sols., Inc.*, 2024 WL 4453292, at *7 (N.D. Cal.

Oct. 8, 2024); *Deneau v. Coastal Home Care Servs., Inc.*, 2024 WL 3844723, at *4 (N.D. Cal. Aug. 12, 2024).

**B. The FAA applies to the arbitration agreement in the ExtraCare Terms.**

The first question the Court must answer is whether the FAA covers the relevant contract. *Christian v. Pressed Juicery, Inc.*, 2021 WL 4771801, at *2 (C.D. Cal. Apr. 23, 2021) (citing *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019)).

The FAA applies to any "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The Supreme Court has interpreted "involving commerce" as covering "more than only persons or activities *within the* flow of interstate commerce." *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 273 (1995) (quotation and citation omitted; emphasis original). The FAA "reaches as far as the Commerce Clause itself." *Id.* at 276; *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (per curiam) ("[The Supreme Court] ha[s] interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." Here, the Terms at issue, and CVS's retail business generally, indisputably "affect commerce" because the services offered to Wittman included promotions and product discounts.

Since Wittman alleges she is a resident of California and purports to represent a class of consumers nationwide (*see* Complaint ¶¶ 10, 49–61), and since CVS is a Rhode Island entity (*see id.* ¶ 11), the Terms represent an agreement between citizens of different states. The Parties' dispute therefore involves interstate commerce. *Valdez v. Genesis Healthcare LLC* 2019 WL 6604868, at *5 (C.D. Cal. July 15, 2019) (transactions between diverse parties necessarily affected interstate commerce). The fact that some ExtraCare members, including Wittman, access the program by shopping online bolsters the conclusion that the contract at issue affects interstate commerce. *E.g., Hofer v. Emley, 2019 WL 4575389, at *12* (N.D. Cal. Sept. 20, 2019) (holding that "the transaction contemplated under the Agreement affects interstate commerce because" the defendant's customers

access its services via the internet) (citing *United States v. Sutcliffe,* 505 F.3d 944, 953 (9th Cir. 2007)) (internal quotations omitted).

In addition, "[p]arties may … voluntarily elect to have the FAA govern enforcement of the Agreement." *Victrola 89, LLC v. Jaman Props. 8 LLC,* 46 Cal.App.5th 337, 355 (2020). Here, the Parties did just that. The arbitration provision in the Terms unambiguously states: "You and CVS agree that this Agreement affects interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and federal arbitration law apply to this Arbitration Agreement and govern all questions as to whether a Dispute is subject to arbitration." (Asermely Decl. Exh. C at p.10).

Given the foregoing provisions, enforcement of the Parties' clear and unequivocal agreements to apply the FAA in this case is warranted. *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) ("[C]ourts must 'rigorously enforce' arbitration agreements according to their terms, [citation], including terms that 'specify with whom [the parties] choose to arbitrate their disputes,' [citation], and 'the rules under which that arbitration will be conducted[.]' [Citation].") (Citations omitted; emphasis omitted).

**C. An arbitration agreement exists and is valid and binding.**

After determining that the FAA applies, the Court must then consider two "gateway" questions: (1) whether a valid agreement to arbitrate exists, and (2) whether the dispute falls under the arbitration clause. *Christian*, 2021 WL 4771801, at *2.

Here, the arbitration provisions are valid and binding. CVS, as the party seeking to compel arbitration, bears—and has borne—the burden of proving "the existence of an agreement to arbitrate" only "by a preponderance of the evidence." *Moran v. Charter Commc'ns, Inc.*, 2020 WL 5833640, at *2 (C.D. Cal. June 11, 2020) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). Once the moving party establishes the existence of an arbitration agreement as is the case here, the burden shifts to the opposing party to establish the factual basis for a defense to enforcement. *Id.* Again, Wittman cannot meet that burden here.

In determining whether parties agreed to arbitrate, "courts . . . apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944(1995)*; Voll v. HCL Techs. Ltd.,* 2019 WL 144863, at *5 (N.D. Cal. Jan. 9, 2019). Under California law, "mutual assent is the key to contract formation." *Cordas v. Uber Techs., Inc.,* 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017). In applying this standard, courts hold that "in the absence of any alleged fraud, overreaching, or excusable neglect, [a] [p]laintiff is deemed to have assented to all of the agreement's terms, whether or not he actually understood or even read them." *Marselian v. Wells Fargo & Co.,* 514 F. Supp. 3d 1166, 1173 (N.D. Cal. 2021); *see also Blau v. AT&T Mobility,* 2012 WL 10546, at *4 (N.D. Cal. Jan. 3, 2012) ("Defendants have demonstrated that Plaintiffs agreed to arbitrate by demonstrating that Plaintiffs agreed to Defendants' terms of service."). As other jurisdictions applying and adopting California law have recognized, when a consumer receives the terms of service and proceeds to use their account, consent is established through conduct. *See, e.g., Campos v. Bluestem Brands, Inc.,* 2016 WL 297429, at *10 (D. Or. Jan. 22, 2016) ("Regardless of whether [a plaintiff] read, signed, or understood the Agreement [governing her account]," she objectively manifests assent to its arbitration provision when "after receiving the Agreement, [she] use[s] her . . . account.") "Even if an offeree lacked actual notice of the terms, … he may be bound if he manifested his consent and "a reasonably prudent user would [have] be[en] on inquiry notice of the terms." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–75 (2d Cir. 2017) (applying California law); *accord Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021)*; Gambo v. Lyft, Inc.,* 642 F. Supp. 3d 46, 55 (D.D.C. 2022) (enforcing the arbitration provision because "[e]ven if an offeree lacked actual notice of the terms … he may be bound if he manifested his consent and a reasonably prudent user would [have] be[en] on inquiry notice of the terms.").

"Mutual assent may be manifested by written or spoken words, or by conduct and acceptance of contract terms may be implied through action or inaction." *Id.* (internal citations and quotation marks omitted). Under California law, "it is essentially irrelevant whether a party actually reads [a] contract or not" in determining whether a valid contract

exists, "so long as the individual had a legitimate *opportunity* to review it." *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1198 (N.D. Cal. 2015), *rev'd in part on other grounds*, 848 F.3d 1201 (9th Cir. 2016) (citation omitted, emphasis in original).

For example, in *Graf v. Match.com, LLC*, 2015 WL 4263957 (C.D. Cal. July 10, 2015), this Court ruled that users of Match.com's website agreed to an arbitration provision in the Terms of Use "when they clicked on a 'Continue' or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review." *Id.* at *4; *see also Rodriguez*, 2015 WL 12656919, at *2 (finding assent to an arbitration clause in a terms of use when the "Website contained a hyperlink to the Terms of Use at the bottom of every page and included an express disclosure and acknowledgement, which stated 'By clicking the button above ... you agree to our Terms of Use,'" which were hyperlinked); *Dickey v. Ticketmaster*, 2019 WL 9096443, at *6-7 (C.D. Cal. Mar. 12, 2019) (ruling similarly). Numerous other Ninth Circuit courts have reached similar conclusions in internet contract cases like this one. *See, e.g., Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal., 2011) (concluding that where a user was provided with an opportunity to review the terms of service in the form of a hyperlink immediately below the acceptance button, the user had agreed to the terms and was bound by them).[3]

The very recent case of *Brewer v. Jersey Mike's, Inc. et al. Additional Party Names: Justin Brewer*, 2026 WL 2367683, at *2 (C.D. Cal. Aug. 6, 2026), is instructive. In that case, this Court held that a defendant moving to compel arbitration had carried its burden of

[3] *See also Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (enforcing forum selection clause found in the terms and conditions on website where, at the final page of placing an order, plaintiff was required to click a "Place Order" button and language on the same page stated that "by clicking Place Order below, you are agreeing" to the website's terms and conditions, which were hyperlinked); *Tanis v. Sw. Airlines, Co.*, 2019 WL 1111240, at *7 (S.D. Cal. Mar. 11, 2019) ("Simply because Plaintiff may not have clicked the hyperlink (and was not required to before checking the box) ... does not make its existence hidden or unclear.") (citing *Mohamed*, 109 F. Supp. 3d at 1198).

establishing a valid agreement to arbitrate by presenting evidence showing that the plaintiff "was a registered user of its online ordering system; that in April 2018 JMFS emailed Plaintiff notifying him of the updated 2018 Terms and providing a hyperlink to review them; that the email advised Plaintiff that continued use would constitute acceptance of those terms; and that Plaintiff opened the email and continued to use JMFS's website and App for approximately six years." *Brewer* is joined by other courts that have granted motions to compel based on emails sent to consumers containing a hyperlink to updated terms of service that included an arbitration provision. *See, e.g., Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 932 (N.D. Cal. 2024) ("The record indicates that Coursera sent Plaintiff the updated terms via email on December 18, 2020. Thus, the Court finds that Coursera has established that Plaintiff was on inquiry notice of the changed terms such that they are binding on Plaintiff…. [T]he language in the email is reasonably conspicuous because the header clearly states that the email included updates to the TOU, the TOU hyperlink is in blue font and stands out from the remaining text, and the hyperlink is followed by a description of the TOU which specifically calls out '[u]pdated arbitration language.' [Citation.]") (citation omitted); *Sadlock v. Walt Disney Co.*, 2023 WL 4869245, at *12 (N.D. Cal. July 31, 2023) (emails with updates gave plaintiff reasonably conspicuous notice of the agreement where subject line notified users of the update, the header repeated the language regarding updates, the email contained "clear" hyperlink to agreement, and the email "call[ed] out" the "express update to the arbitration agreement"); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (finding that plaintiffs were bound by the defendant's updated terms where they received an email from the defendant that the terms of the user agreement were changing and continued to use the defendant's services); *West v. Uber Techs.*, 2018 WL 5848903 at *5, (C.D. Cal. Sept. 5, 2018) ("when consumers receive emails" notifying them of updates to terms of use, including revisions to the arbitration agreement, "continued use of the service or product constitutes assent to the updated terms"); *Webber v. Uber Techs., Inc.*, 2018 WL 10151934, at *4 (C.D. Cal. Sept. 5, 2018) (same); *In re Uber Techs., Inc.*, 2019 WL 6317770, *4 (C.D. Cal. Aug. 19, 2019)

(same); *Kamath v. Coinbase, Inc.*, C23-3533, 2024 WL 950163, at *4 (N.D. Cal. Mar. 5, 2024) (same).

The reasoning of this Court and other courts in the above-cited authority dictates the same result here. As a CVS ExtraCare member, Wittman was sent the March 19, 2025 email at the address she provided for communications, notifying her that the "ExtraCare Terms & Conditions … have been updated"—including, specifically, the "Dispute Resolution terms." (Asermely Decl. ¶¶ 9–16 and Exh. B). The email subject line was clear: "Updates to ExtraCare Terms and Conditions." (*Id.*). The email contained two prominent hyperlinks to the updated Terms, one of which was set out in a red box with white letters that invited Wittman to "Review updated terms and conditions." (*Id.*). The email explained that "[b]y continuing to use and enjoy the benefits of your ExtraCare membership, you acknowledge that you have read and agreed to these updated terms and conditions." (*Id.*). Wittman thereafter continued to make more than 50 purchases by which she sought and received the benefits of her ExtraCare account—including the purchase underlying her claims in this case—thereby manifesting assent to the Terms, including the Dispute Resolution provisions. (Asermely Decl. ¶ 28). By continuing to shop at CVS after receiving this notice, and by using her ExtraCare account to reap further benefits, Wittman repeatedly manifested assent to the Terms.

As in *Ghazizadeh*, the language in the March 19, 2025 email "is reasonably conspicuous because the header clearly states that the email included updates to the" ExtraCare Terms, the email clearly explains that the terms are being updated. The email also explains that the updates to the Terms include the Dispute Resolution provisions. The email also included two hyperlinks to the updated terms, one of which was conspicuously offset from the rest of the email. *Ghazizadeh*, 737 F. Supp. 3d at 928. "This is not a situation where the reference to the arbitration agreement was buried and difficult to discern." *Sadlock*, 2023 WL 4869245, at *12. The March 19, 2025 email also explained that the updated terms will apply to future purchases, stating: "[b]y continuing to use and enjoy the benefits of your ExtraCare membership, you acknowledge that you have read and agreed

to these updated terms and conditions." The *Sadlock* court held that similar language "provided reasonably conspicuous notice of the Subscriber Agreement and that Mr. Sadlock unambiguously manifested assent to the terms of the agreement by continuing to use the streaming service after he received the emails." *Id.* at *13; *see also Ghazizadeh*, 737 F. Supp. 3d at 928–33.

This is not a situation where CVS emailed Wittman out of the blue. Instead, Wittman had a multi-year, ongoing relationship with CVS through its ExtraCare program, and regularly used her membership to receive benefits in the form of discounts and coupons, some of which benefits were communicated to Wittman on a regular basis, including by email. (Asermely Decl. ¶¶ 2, 7, 28). Thus, "[t]here was undisputedly an agreement of some kind" in place before March 19, 2025, and there is no reason CVS should not be permitted to modify that agreement, and email is the obvious means to do so. *Id.; see also Keebaugh*, 100 F.4th at 1019-20 (noting forward-looking nature of the parties' relationship and that "users would understand that their use of an app that allows for in-app purchases would be governed by some terms of use"); *Ghazizadeh*, 737 F.Supp.3d at 925 (noting that, unlike a "'one-and-done' traditional website," users of the defendant's services would or should expect their "access to the platform would be continual and governed by some terms of use.") (citations omitted); *Oberstein v, Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023) (courts consider whether a transaction "reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship.") (citing *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 480 (2021)).

Wittman received the updated Terms on March 19, 2025 and agreed to those Terms when she decided to continue using her membership benefits. She received the benefits of being an ExtraCare member including paying discounted member prices, receiving cash back on purchases, and more. Wittman should not be permitted to reap the benefits of her membership without also having to comply with her end of the agreement.

**D. The dispute falls within the broad scope of the Arbitration provisions.**

The answer to the second "gateway" question, *i.e.*, whether the dispute falls under the arbitration clause, is also "yes." *Christian*, 2021 WL 4771801, at *2.

Wittman's allegations in this case—which involve her purchase of CVS Calcium using her ExtraCare account—fall within the arbitration clause's broad scope. The Terms are clear and provide that "YOU AND CVS AGREE THAT ANY DISPUTE (DEFINED BELOW) SHALL BE RESOLVED BY FINAL AND BINDING INDIVIDUAL ARBITRATION…." (Asermely Decl. Exh. C at p.9). "Dispute" is broadly defined to include:

> any claims or controversies between you and CVS that are related in any way to this Agreement, including, but not limited to, your use of the Site, sales, returns, refunds, cancellations, defects, policies, privacy, advertising, and/or any communications between you and CVS, whether occurring on the Site, in-store, or otherwise, even if the Dispute arises after the termination of your relationship with CVS. "Dispute" also includes, without limitation, claims that: (a) you bring against CVS; (b) CVS brings against you; (c) in any way relate to or arise out of any aspect of the relationship between you and CVS, whether based in contract, tort, statute, fraud, misrepresentation, advertising claims, or any other legal theory; (d) arose before you entered into this Agreement or out of a prior agreement with CVS (including, without limitation, claims relating to advertising); (e) are subject to ongoing litigation where you are not a party or a member of a certified class; and/or (f) arise after the termination of this Agreement.

Arbitration provisions like this one are "routinely used . . . to secure the broadest possible arbitration coverage," and are regularly enforced. *Britton v. Co-op Banking Grp.,* 4 F.3d 742, 745 (9th Cir. 1993); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 113 (9th Cir. 2000); *Cayanan v. Citi Holdings, Inc.,* 928 F. Supp. 2d 1182, 1207 (S.D. Cal. 2013).

Additionally, "incorporation of the NAM Rules constitutes 'clear and unmistakable' evidence that contracting parties agreed to arbitrate arbitrability." *Brennan,* 796 F.3d at 1130. The Terms incorporate the NAM "Comprehensive Dispute Resolution Rules and Procedures and/or the Mass Filing Supplemental Dispute Resolution Rules and Procedures." (Asermely Decl. Exh. C at p.12).

The FAA's "principal purpose . . . is to ensure that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 343 (2011) (citation omitted)*; see also Am. Exp. Co. v. Italian Colors Rest.,* 570 U.S. 228, 233 (2013) ("[C]ourts must 'rigorously enforce' arbitration agreements according to their terms."). Lest the Court hesitate on this point, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone,* 460 U.S. at 24–25.

**E. Wittman did not opt out of the arbitration provisions.**

The opt-out provision in the Terms is simple: members are informed: "You have the right to opt out of arbitration by sending your personally signed, written notice of your decision to opt out to the following address:…" (Asermely Decl. ¶ 25 & Exh. C at p.16). Wittman had inquiry notice, if not actual notice, of her right to opt out—and did not do so.

**F. The arbitration should proceed on an individual basis.**

As noted above, the Terms contain two explicit class action waivers: one in the arbitration provision itself and one standalone provision. (Asermely Decl. ¶¶ 23–24 & Exh. C at pp.10, 13, 16). As the Ninth Circuit has held, class action waivers in arbitration provisions are enforceable. *See Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1225-26 (9th Cir. 2012) ("Importantly, the FAA meant what the [Supreme] Court in *Concepcion* says it means--that the Customer Agreement's class waiver is enforceable …." (citing *Concepcion*, 563 U.S. at 1748)). Accordingly, an order compelling individual arbitration is warranted.

**G. A stay of all case deadlines is requested while the Court considers this motion.**

Federal courts in the Ninth Circuit and elsewhere routinely stay discovery and other scheduling deadlines in cases where, as here, there is a motion to compel arbitration pending. *See, e.g., Stiener v. Apple Computer, Inc.*, 2007 WL 4219388, at *2 (N.D. Cal. Nov. 29, 2007) (granting motion to stay obligations under the court's scheduling order pending resolution of motion to compel arbitration because if the motion is granted the case will proceed to arbitration and "responsibility for the conduct of discovery [will] lie[] with the

arbitrators" and noting that granting short stays of initial scheduling obligations and discovery are a "common practice" among federal courts) (citing various cases); *Intertec Contracting v. Turner Steiner Int'l, S.A.*, 2001 WL 812224, at *7 (S.D.N.Y. July 18, 2001) ("As is the general practice of district courts, a stay of discovery was imposed in this case while the motion to compel arbitration was pending before the Court."). This Court is requested to rule similarly in this instance, staying all discovery and other case deadlines for the sake of judicial and party economy during the pendency of this Motion.

**CONCLUSION**

For the foregoing reasons and such additional reasons as may be presented, CVS respectfully requests the Court enter an order: (i) compelling Wittman to arbitrate her claims in this case on an individual basis, (ii) staying this action in favor of arbitration, and (iii) granting all other relief the Court deems just and proper, including staying all discovery and other scheduling deadlines during the pendency of this Motion.

Dated: August 31, 2026

TATRO TEKOSKY SADWICK LLP

By: */s/ René P. Tatro*
René P. Tatro, Esq.
Attorneys for Defendant CVS Pharmacy, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August 2026, I electronically filed

**CVS PHARMACY, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION**

with the Clerk of the court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Lilach H. Klein
Zachary M. Crosner
**Crosner Legal, P.C.**
9440 Santa Monica Blvd., Ste 301
Beverly Hills, CA 90210
lilach@crosnerlegal.com
zach@crosnerlegal.com

L. Timothy Fisher
Bursor & Fisher, P.A.
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
ltfisher@bursor.com

/s/ *Karen L. Roberts*
Karen L. Roberts